**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JONES LANG LASALLE AMERICAS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-03540 |
| | ) | |
| DAVID MARTIN, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff/Counter-Defendant Jones Lang LaSalle Americas, Inc. ("JLL") has sued Defendant/Counter-Plaintiff David Martin—a real estate broker and former JLL employee—for breach of contract. In 2018, JLL recruited Martin to join the firm's Denver office, offering him a $1,000,000 loan, which JLL later increased to $1,375,000. The loan was forgivable over time on terms outlined in a promissory note, which included a provision that JLL would forgive any unpaid portion of the loan if the Martin were to resign from JLL for "Good Reason."

More than a year after Mr. Martin signed the note, JLL acquired another firm, resulting in the addition of two brokers to the office where Martin worked. After the acquisition, JLL adopted a new method of managing personnel and marketing costs, and the now-larger Denver team shared commissions among more brokers. Martin believed that the post-acquisition compensation changes were to his detriment, and he left JLL without paying back his loan. In this lawsuit, JLL seeks recovery of the unpaid balance. Martin contends his resignation was for "Good Reason," meaning that he is excused from paying the debt, and he has filed a counterclaim for recovery of commissions on deals he claims to have negotiated before his departure. For a second time, both parties have moved for summary judgment. In response to the earlier motions, the court directed the parties to provide financial records that would confirm or rebut Martin's claims that the new arrangement prejudiced him. Neither side has fully complied with that direction, but the court concludes, as described below, that Martin did not establish "Good

Reason" for his resignation.  Accordingly, Plaintiff's motion for summary judgment is granted and

Defendant's motion for summary judgment is denied.

## BACKGROUND[1]

Defendant David Martin is a licensed commercial real estate broker in Denver, Colorado.

(Def.'s Statement of Material Facts ("DSOF") [128] ¶ 1.)  In early 2018, Mr. Martin was working

with two other commercial real estate brokers, Pamela Koster and Mike Grippi, at the Denver

office of a firm called Moran & Company.[2]  (DSOF ¶ 4; Dep. of David Martin ("Martin Dep."), Ex. B

to DSOF [128-2] at 15:10–14.)  In March 2018, Plaintiff JLL, a professional services firm that

specializes in real estate and investment management, began recruiting the three brokers.

(DSOF ¶¶ 3, 5; Pl.'s Statement of Material Facts ("PSOF") [133] ¶ 1.)[3]  Martin and JLL negotiated

potential terms of employment; according to Martin, Ms. Koster and Mr. Grippi did not participate

---

[1]    For reasons discussed below, the facts set forth herein are sufficient to resolve
each party's motion for summary judgment.  The court need not consider, for example, the parties'
disputes about certain pre-contract negotiations (and whether such negotiations are admissible
under the parol evidence rule), or the relative financial success of JLL and Martin before, during,
or after Martin's employment at JLL.

[2]    JLL included a declaration by Pamela Koster as an exhibit to its statement of
material facts.  Martin moves to strike the Koster declaration on the basis that it is "conclusory
and not based on matters that Ms. Koster is competent to testify about" and because it is
"contradictory to the sworn deposition testimony of JLL's corporate representatives."  (Def.'s Mot.
to Strike [145] at 2.)  "Motions to strike all or portions of an opposing party's LR 56.1 submission
are disfavored" in the Northern District of Illinois.  LR 56.1(e)(2).  Rather than filing a separate
motion, Martin can—and in fact did—challenge Ms. Koster's testimony in response to JLL's
statement of material facts.  (See, e.g., Def.'s Resp. to Pl.'s Statement of Facts ("PSOFR") [143]
¶ 49.)  The court notes in this regard that Martin appears to misunderstand the "sham-affidavit
rule," which "prohibits a party from submitting an affidavit that contradicts *the party's* prior
deposition or other sworn testimony."  *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (emphasis
added).  In any event, the portions of Koster's declaration that Martin targets in his motion to strike
are not actually discussed by the court for the reasons noted in Footnote 1, above.  Martin's
motion to strike [145] is denied.

[3]    Mr. Martin objects to this and many other of Plaintiff's statements of fact, arguing
that they are immaterial or irrelevant, or that they improperly rely Ms. Koster's testimony.  (See
PSOFR ¶¶ 1, 8, 10, 11, 19–23, 28, 31, 32, 35, 47–52; Def.'s Resp. to Pl.'s Statement of Add'l
Facts ("PSOAFR") [152] ¶¶ 1–4, 6–10.)  As noted, this decision does not turn on portions of Ms.
Koster's submissions that Martin challenges, and the court has explained the relevance of other
evidence to which he objects.  Those objections are generally overruled.

in the negotiations. (Martin Dep. at 22:6–10; Am. Decl. of David Martin ("Martin Decl."), Ex. A to DSOF [128-1] ¶¶ 27–30; DSOF ¶ 32.) The parties agreed that, as an incentive to join the firm, JLL would give the three brokers forgivable loans in the total of $2.75 million, an amount that the parties believed accurately reflected the value that Martin and his team would bring to JLL. (PSOF ¶ 4; DSOF ¶ 9.) The recruitment negotiations were successful: the three brokers agreed to join JLL, and Martin and JLL agreed to terms memorialized in an "Employment Agreement" and a "Promissory Note." (DSOF ¶¶ 6, 7.) Martin, Koster, and Grippi left their former employer to form JLL's Multifamily Investment Services Group ("Denver Multifamily team"), a subgroup of JLL's Capital Markets Groups ("CMG") on or about April 16, 2018. (PSOF ¶ 3.)

## I. The Employment Contracts

Three documents are at the center of the parties' breach-of-contract claims: the Employment Agreement, the Amended Promissory Note, and the Americas Capital Markets Compensation Plan for Producers ("Comp Plan"). The terms of those documents are summarized below.

### A. Employment Agreement

 Under his Employment Agreement with JLL, effective on April 16, 2018, Mr. Martin had the title of JLL Managing Director. (DSOF ¶ 16.) By its terms, the Employment Agreement was a fully integrated document that could be modified only in a writing signed by the parties. (PSOF ¶ 17.) A paragraph titled "Compensation & Expenses" sets forth Mr. Martin's compensation structure:

> JLL will provide Employee compensation and expense reimbursement in accordance with the attached Exhibit A. Employee agrees that revenue for any and all commercial real estate activities in which Employee is involved during the Term of this Agreement belongs to Company and Employee will be paid Employee's share of that revenue consistent with this agreement.

(Employment Agreement, Ex. C to DSOF [128-3] ¶ 2.) As set forth in "Exhibit A" to the Agreement, JLL agreed to pay Martin "[c]ommission percentages" of calendar year revenue "attributed" to him, on a sliding scale: for revenue of $0 to $500,000, Martin earned 50% commission; for

revenue of $500,001 to $750,000, he earned 55% commission; and for revenue greater than $750,000, he earned 60% commission. (Employment Agreement, Exhibit A.)

Exhibit A includes other information pertinent to this case as well. For one, Exhibit A references Mr. Martin's forgivable loan in the amount of $1,000,000 "pursuant to the terms of a separate promissory note to be provided by JLL," and states that Martin would "be required to sign the promissory note as a condition to receiving the forgivable loan." (Employment Agreement, Exhibit A.) Exhibit A also sets forth a budget for Martin's personnel and marketing expenses. As compensation for personnel Martin would hire, JLL agreed to provide $209,000 in the first year of his employment, and thereafter 6% of gross revenues he generated. (*Id.*) For marketing costs, JLL agreed to provide "$96,000 for year 1 and 3% of gross revenues per year thereafter." (*Id.*)

The Employment Agreement also provides for Martin's participation in JLL's employee benefits program, including "medical, dental, life, disability insurance, and a 401k savings and retirement plan." (Employment Agreement ¶ 3.) Paragraph 4(b) of the Employment Agreement addresses what would occur in the event of Mr. Martin's termination or resignation from JLL. It states, in relevant part:

> Upon a termination of this Agreement by Employee for any reason or by Company without Cause, and if Employee executes and does not revoke a Confidential Separation Agreement and General Release in substantially the same form attached hereto as Exhibit A, subject to any modifications that may be necessary for it to comply with applicable state or federal law at the time of termination, Employee is entitled to receive the additional payments and benefits provided by the Comp Plan then in effect, except that any payment is subject to offset, as permitted by law, for any outstanding loans, company credit card balances, or other debts that Employee owes Company.

(*Id.* ¶ 4(b).) For reasons that are unexplained, the referenced "Confidential Separation Agreement and General Release" was not attached to the Employment Agreement. (DSOF ¶ 18.)

**B.    The Promissory Note**

Mr. Martin, Ms. Koster, and Mr. Grippi each received their portion of the $2,750,000 pursuant to the terms of their individual promissory notes. (DSOF ¶ 22; DSOFR ¶ 22.) According

4

to Martin, the three brokers decided how to split the lump sum $2.75 million-dollar payment among themselves. (Martin Dep. at 42:19–50:5.) Martin and Koster each took $1,000,000, and Grippi, who had worked with them for a short period of time, agreed that his share would be $750,000. (*Id.*) In April 2018, Martin and Paul Washington—JLL's Market Director—executed a Promissory Note (as referenced in the Employment Agreement) that made Martin's loan of $1,000,000 forgivable over time and under certain terms and conditions.[4] (DSOF ¶ 20; Promissory Note, Ex. D to DSOF [128-4].) Soon after the three brokers joined JLL, Grippi voluntarily left JLL and returned his $750,000 loan; JLL then reallocated that money equally between Martin and Koster, bringing the total loan to Martin to $1,375,000, as reflected in an Amended Promissory Note dated October 31, 2018. (DSOF ¶¶ 28–30; Am. Promissory Note, Ex. E to DSOF [128-5].)

The Amended Promissory Note provides that an increasing portion of the loan would be forgiven once each year over a period of up to six years, creating an incentive for Martin's continued tenure and productivity at JLL: the portion to be forgiven each year is determined by multiplying a percentage figure (which increases over the six-year period) by the total revenue attributable to Martin for that year.[5] (Am. Promissory Note § 2.) The Note includes a maturity date of December 31, 2024; any remaining balance that JLL had not forgiven by that date would become due, and Martin would be required to repay the remaining balance of the loan within 30 days. (*Id.* § 3.)

---

[4]   According to the Promissory Note, interest accrued on the loan balance "at the IRS required minimum rate for employee loans (2.57% for March 2018)" and interest would "be calculated annually and added to the unpaid Principal then outstanding." (Promissory Note, Ex. D to DSOF [128-4] ¶ 1.)

[5]   Specifically, the Amended Promissory note states that, in addition to any forgiveness already accrued under the original promissory note, JLL would forgive the remaining debt at a rate of: (a) 8% per dollar attributed to Martin for which cash has been collected in accordance with Exhibit A to the Employment Agreement through December 31, 2022; (b) 10% per dollar of revenue attributable to Martin for which cash has been collected in year 2023; and (c) 20% per dollar revenue attributable to Martin for which cash has been collected in calendar year 2024. (Am. Promissory Note § 2.)

The remaining balance would also become due within 30 days if Martin were to "resign[ ] without Good Reason, die[ ], become[ ] Disabled, or [be] terminated for Cause under the Agreement (as those terms are defined in the Agreement) . . . before the loan is forgiven in its entirety." (*Id.*) If, on the other hand, Martin were to resign "with Good Reason" or JLL were to terminate him "without Cause," any unforgiven portion of the loan would be "forgiven in its entirety." (*Id.*) The Note defines, in the same paragraph, the two circumstances that constitute "Good Reason," only one of which is relevant here: "[JLL] materially changes [Martin's] commission splits or benefits package to the detriment of [Martin] without [Martin's] prior written consent, unless such change applies to all similarly-situated employees of [JLL]." (*Id.*) The Note also imposes a notice requirement on Martin before JLL will forgive the loan:

> Notwithstanding the foregoing, [Martin] may only effect a resignation for Good Reason if [Martin] provides written notice of the basis for such resignation and [JLL] fails to cure within thirty (30) days following receipt of such notice. If [JLL] fails to cure, the resignation for Good Reason shall then be effective on the 31st day following [JLL's] receipt of the notice.

(*Id.*)

### C. The Comp Plan

The Employment Agreement incorporates the Comp Plan by specific reference,[6] and the Comp Plan provides further details on how commission was to be allocated between brokers and JLL, and among the brokers themselves. It states that "[r]evenue is allocated to Producers and/or other team members consistent with the individual's participation in generating the Revenue, as determined by agreement of the transaction team generating the Revenue." (Comp Plan, Ex. 10 to PSOF [138] § 1(b)(i).) In other words, if multiple brokers work on a deal together, they decide among themselves how to split the revenue they earn; there is no genuine dispute that JLL neither provides input into nor interferes with that decision. (PSOF ¶ 11 (citing the JLL Comp Plan and

---

[6] As noted above, under Paragraph 4(b) of the Employment Agreement, if certain conditions are met, Martin would be "entitled to receive additional payment and benefits provided by the Comp Plan."

testimony that it is up to brokers themselves how to split revenue among their team members); PSOFR ¶ 11 (citing deposition testimony that makes no mention of JLL involvement with brokers' decisions to split commissions among themselves).)

The Comp Plan also details the brokers' entitlement to commission after their employment ends for deals that they worked on during their time at JLL. Relevant here are the Comp Plan's provisions concerning such "trailing commissions":

> Except as otherwise agreed to by Producer and Company upon termination, for engagements or transactions that are not closed before the termination date, subject to the mutual execution of a Separation Agreement by Company and Producer, except as otherwise agreed to by Producer and Company upon termination, Producer will receive revenue credit for each transaction based upon the mutual agreement of the transaction team members for Protected List engagements or transactions that are recognized by the Company within 180 days after the termination date, and for which the Company receives payment within one year after the termination date.

(Comp Plan § 2(b).) The Comp Plan further provides that Martin is not eligible for any trailing commissions if he "violates any material contractual or ethical obligations to [JLL]." (*Id.*)

## II. JLL's Acquisition of HFF

The above provisions became relevant to Mr. Martin following a change in JLL's corporate structure in the summer of 2019. After Mr. Grippi's departure and up until that point, the Denver Multifamily team had consisted of Mr. Martin and Ms. Koster. (PSOF ¶ 20.) In July 2019, JLL acquired HFF, Inc. ("HFF"). (*Id.*) As a result of that acquisition, two new brokers, Jordan Robbins and Anna Stevens, joined Martin and Koster on the Denver Multifamily team. (*Id.*; PSOFR ¶ 20.) JLL personnel colloquially referred to the employees, systems, processes, policies, and agreements historically associated with JLL as "J-Leg" (short for "JLL Legacy") and referred to the people and things associated with HFF prior to the acquisition as "H-Leg" (short for "HFF Legacy"). (PSOF ¶ 21.) The Denver Multifamily J-Leg and H-Leg brokers combined their existing books of business and began a joint sales approach. (*Id.* ¶ 22.) Martin takes issue with two consequences of the acquisition: (1) JLL's new method for handling certain administrative

expenses, such as support staff bonuses and marketing funds; and (2) what Martin characterizes as pressure to divide commissions for each deal among more brokers.

### A. The 8 Percent "Scrape"

After the acquisition, JLL introduced a new model for dealing with personnel and marketing expenses. (*See* Pl.'s Statement of Add'l Facts ("PSOAF") [149] ¶ 3.) Martin refers to the new method as a "scrape." At a hearing on earlier dispositive motions, this court repeatedly asked the parties to explain how "the scrape correspond[s], if at all, to the personnel budget that [Martin] was getting under JLL and maybe or maybe not getting under the new arrangement." (Transcript of August 15, 2022 Oral Argument ("Transcript") [116] at 33:24–34:3.) The court made clear to the parties that what "is necessary is numbers." (*Id.* at 32:19–21.) Neither party has adequately satisfied the court's request for financial records. As a result, the facts for this section primarily come from deposition testimony rather than the hard evidence that the court specifically requested.

Prior to JLL's acquisition of HFF, when a deal closed, JLL set aside 3% of the total deal revenue to pay for marketing expenses.[7] (Employment Agreement, Exhibit A; Martin Dep. at 28:24–29:10.) Brokers were free to spend more or less than that 3%; if they spent less, the remaining amount would roll over for future expenses, and, if they spent more, the overage would come out of the broker's commissions. (Martin Dep. at 28:24–29:10.) Additionally, under the earlier plan, JLL set aside 6% of gross revenues per year to cover the salaries and bonuses of non-broker staff. (*Id.*)

After JLL acquired HFF in July 2019 and up until Mr. Martin's departure from JLL in early 2020, JLL toyed with moving away from the 6%/3% method outlined in Exhibit A of the

---

[7] According to Mr. Martin's deposition testimony, this 3% marketing budget could be used to cover "travel and entertainment expenses." (Martin Dep. at 29:1–10.)

Employment Agreement and § 1(b)(iii) of the Comp Plan.[8]  JLL considered adopting HFF's expense model instead.  When a deal closed under the H-Leg model, 4% of the total deal revenue was allocated to fund "enterprise support," which, according to JLL's corporate representative, was used to "fund the business" (Dep. of Mark Katz ("Katz Dep."), Ex. 12 to PSOF [138] at 23:23–25), and another 4% was allocated to fund the "Support Bonus Pool," which brokers "in their sole discretion" could allocate to their support team (*id.* at 24:1–4).  According to JLL, this new scheme was "equivalent" to the J-Leg marketing budget.[9]  (PSOF ¶ 64.)  Under the new 8% cost structure, all personnel and marketing costs were covered by JLL, and brokers were not required to pay back overages to JLL if they exceeded their budget.[10]  (PSOAF ¶ 3.)

JLL's corporate representatives testified regarding the rationale for and consequences of this new model.  Mark Katz, the Denver Office Head at the time, explained that a "[b]ig

---

[8]　　Section 1(b)(iii) of the Comp Plan states in relevant part: "Revenue must be allocated to cover support costs when base salaries exceed budgeted amount, as well as to fund bonuses for non-Producers, at 2 times the actual draw and/or salary and bonus amounts. Allocated Revenue is applied first to cover salaries, if any; next to cover non-recourse draw, if any; and last to cover recourse draw, if any."  (PSOF ¶ 62.)  Neither party has explained what a "recourse draw" is.

[9]　　Mr. Martin asserts that "[t]he 8% scrape was not the equivalent of the J-Leg marketing budget" (DSOFR ¶ 64), but does not otherwise explain the significance of the change. The court notes that in the new program, the firm extracted 8% rather than 9% from each transaction; Mr. Martin does not clearly explain how the smaller extraction \was less advantageous to him than a 9% model.  The only record evidence approaching the topic comes from the declaration of Nancy O. Goodson, JLL's Chief Operating Officer, U.S. Capital Markets. (*See* Decl. of Nancy Goodson ("Goodson Decl."), Ex. 28 to PSOF [138].)  Ms. Goodson asserts that she calculated Martin's 2019 commissions under both the new and old compensation plans and cost structures and found that the 8% model was more favorable to Martin.  (*Id.* ¶ 59.) Goodson does not explain her calculation method, and Martin objects to the document on which she relies for lack of authenticity and on grounds that the document was not previously disclosed. (PSOFR ¶ 63.)  But he does not lay a foundation based on numerical evidence that he fared worse under the new model.

[10]　　JLL contends that this change was significant for Martin because in 2019 Martin had exceeded his marketing budget by $49,935.73.  (PSOF ¶ 63.)  But, for reasons that JLL does not explain, JLL did not require Martin to pay back this amount.  (Goodson Decl. ¶ 55.)  Martin objects that these overage calculations were not previously produced in discovery and Martin did not have the ability to depose JLL on the data.

differentiator" between the two plans is that, under the new plan, JLL "pay[s] for all support, so there's no need for a 6 percent [holdback]." (Katz Dep. at 24:5–8.) "[T]here's no need for the 3 percent" in the new plan, Katz explained, because JLL "pay[s] for all marketing expenses," "travel," and "dinners" with "no cap." (*Id.* at 24:15–20.) Mr. Katz testified that, when JLL acquired HFF, it "analyzed every single producer at both firms on both comp plans" and ran approximately "25 different models." (*Id.* at 27:5–21.) JLL asserts that the effect of this change on brokers' recovery was de minimis: "What [JLL] discovered," Katz testified, is that compensation under the two were "within dollars of each other." (*Id.* at 27:18–21.) Gerard Sansosti, another JLL corporate representative, had been employed by HFF before the acquisition, was a member of JLL's Capital Markets Executive Committee, and led the JLL/HFF integration strategy team. (PSOF ¶ 28.) Mr. Sansosti testified that prior to the acquisition, JLL had budgeted 7.9% of total gross revenue for certain expenses while HFF budgeted 8%.[11] (Dep. of Gerard Sansosti ("Sansosti Dep."), Ex. 25 to PSOF [138] at 31:3–6.) Prior to the acquisition, as Sansosti testified, JLL reserved 7.9% as a "holdback." (*Id.* at 30:22–31:13.) Based on Sansosti's understanding, funds from the holdback that were not used to pay bonuses were refunded to the brokers—though he was not aware how often such refunds actually occurred. (*Id.* at 32:13–22.)

Significantly, it is not clear that JLL ever began retaining 8% of gross revenue from the deals Mr. Martin worked on. After the acquisition, JLL management encouraged brokers to adopt the 8% model, but, according to Mr. Katz, JLL "made it very clear that no former J-Leg employee that had an employment agreement had to go onto the new comp plan." (Katz Dep. at 38:13–15, 38:18–21.) Martin insists that after the acquisition, his team "no longer received the personnel and marketing costs as set forth in the Employment Agreement," and was subject to an 8% "scrape" and that, once the JLL and HFF teams combined, "the 6 percent and the 3 percent

---

[11]     It is not clear from the record where this 7.9% figure comes from. JLL asserts that, under the JLL Comp Plan, the company budgeted 9% of collected revenue for certain administrative costs and required repayment of overages.

contribution from JLL . . . went away."  (Martin Decl. ¶¶ 36, 37; Martin Dep. at 36:14–17.)  But Martin's colleague, Ms. Koster confirmed Mr. Katz's version; she stated that she and Martin "were told we could remain on the existing JLL compensation plan" and that the two brokers "discussed the merits of each approach."  (Koster Decl. ¶ 16.)  To Koster's knowledge, "[Martin] did not change to the new compensation plan."  (*Id.* ¶ 17.)  Martin has offered no documentary evidence for his claim that by the time JLL announced the new plan, "[w]e had already moved onto a modified new plan."  (Martin Dep. at 34:7–15.)  To the court's best understanding of the record, the Denver Multifamily team unofficially adopted the 8% model when the HFF brokers joined the Denver office.  Then, however, when JLL received pushback from J-Leg employees who preferred the terms of their old Employment Agreements, JLL relented, and instead offered all J-Leg employees across the country the option in December 2019 to permanently move to the new plan or to remain under their old arrangements.  (*See* Katz Dep. at 38:8–39:5 (explaining that in "initial conversations" JLL wanted everyone "to go to the 4 and the 4" but in "subsequent conversations" several brokers under agreements like Martin's wanted to stick with the old Comp Plan, so "that's ultimately what we did with multiple individuals across the U.S." and "that could have happened with Dave, Pam, or anyone that was in Denver").)

The record also does not make clear how, exactly, JLL moving to an 8% "scrape" rather than a 3%/6% "holdback" structure affected Mr. Martin's total compensation.  Without offering any specific calculations, Martin asserts generally that he would have made more money on deals if JLL had not unilaterally changed the terms of his employment.  (PSOFR ¶ 67.)  Martin contends that JLL's "prior version" of handling personnel and marketing expenses included "a contribution from JLL calculated as 6% of Mr. Martin's gross revenue" for personnel expenses and "the marketing budget was a contribution from JLL calculated as 3% of Mr. Martin's gross revenues." (Def.'s Br. in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Opp.") [142] at 9–10.)  Martin asserts that, by contrast, after the acquisition JLL "deduct[ed] 8% such that brokers only shared 92% of the total revenue from a transaction."  (*Id.* at 10.)  On Martin's view, the new 8% "scrape" was not a

substitution for the prior holdbacks—it was a double subtraction.   The trouble with Martin's position is that he submits no competent evidence to support it.   Martin provides no financial statements or records that show how his compensation changed after JLL's acquisition of HFF.   This court specifically requested financial records such as tax returns to support Martin's contention that JLL changed his compensation to his detriment; Martin has provided none.   On the record before the court, it appears that Mr. Martin misunderstands how JLL's new personnel and marketing budgeting scheme compares with its pre-acquisition holdback model; the former appears to be a close substitute for the latter.   Without financial documents supporting his argument to the contrary, Martin's statements do not establish a genuine factual dispute on this issue.

### B.    Commission Divisions Among Brokers

Under the new model, after a deal closed and JLL retained 8% of the gross revenue from that deal, the Denver Multifamily team brokers divided the remaining 92% among themselves. (PSOF ¶ 11.)  Although nothing in Mr. Martin's Employment Agreement or the Comp Plan dictated how a brokerage team should split commissions among team members (*see id.*; Employment Agreement; Comp Plan § 1(b)(iii)), the practical effect of adding team members to the Denver office was that there were more individuals among whom deal revenue was distributed.   (*See* Martin Dep. at 49:22–50:9.)  On the other hand, the addition of brokers to Martin's team meant that there were more deals—and more revenue—to divide.   This was in part due to the addition of a valuable new team member: Jordan Robbins.  (PSOF ¶ 48.)  Robbins was a star performer. In 2019, $2,039,635.68 in revenue was attributable to Martin and Koster combined, whereas Robbins was responsible for $4,347,559.00 in revenue for the same period.[12]  (*Id.* ¶ 51.)  Koster,

---

[12]    Martin objects to these numbers, arguing that they are based on speculation and are irrelevant because he would have earned more money if JLL did not unilaterally change the terms of his employment.  (PSOFR ¶ 51.)   According to Ms. Goodson's declaration, these numbers come from financial records including Employee Commission Reports and production summaries; Martin, who has had ample opportunity for discovery, has not rebutted that

who Martin described as having an identical Employee Agreement and Promissory Note as himself, received significantly higher commission payments after Robbins joined the team than she earned prior to the acquisition.[13]  (*Id.* ¶ 50.)

According to the Declaration of Nancy Goodson, Mr. Martin was on pace to earn more in commissions after Robbins joined the team than he had for the two years prior.  (PSOF ¶ 54; Goodson Decl. ¶ 26.)  Ms. Goodson asserts:

> Before leaving JLL, Martin was on pace to earn more commissions than he had in his two previous years with JLL. If Martin's earnings remained consistent throughout the year, he would have generated $1,130,637.36 in attributable revenue, which would yield commissions of $615,882.42 based on Martin's applicable commission splits. The projected 2020 commissions are $72,491.73 more than Martin earned in 2019. This straight-line projection fails to account for the fact that the greatest percentage of commissions are earned in the fourth quarter of the year; therefore, it is likely that Martin's commissions would have been higher.

(*Id.*)  As the court understands Ms. Goodson's calculation, her conservative "straight-line projection" is an extrapolation from the fact that Martin worked for about 16.67% of 2020 (two out of twelve months).  Assuming he would bring attributable revenue at that same rate for the remaining ten months, Martin would have earned more than he had in 2018 or 2019, based on those years' Employee Commission Reports (ECRs).  These calculations are, at least, based on financial documents and thus, contra Martin's objection, have some foundation.

### C.    Mr. Martin's Commissions for Particular Deals

The effect of the post-acquisition changes on Mr. Martin's commissions is hotly disputed. Martin has included a chart in his declaration and statement of facts with numbers related to

---

declaration. These figures are directly relevant to the question of whether JLL's post-acquisition policies were detrimental to Mr. Martin.  His objection is overruled.

[13]    As Mr. Martin points out, there are limitations to using evidence of Ms. Koster's ongoing earnings as a comparison for what Martin's earnings would have been had he stayed at JLL because, as a result of Martin leaving the firm, Koster no longer divided commissions with him.  (*See* Def.'s Opp. at 10.)  The parties have not submitted evidence regarding whether JLL hired another broker to replace Martin.

certain deals, but the basis for those figures is unclear, as Martin does not cite or otherwise refer to any specific financial documents. (*See* Martin Decl. ¶ 44; DSOF ¶ 54.) *See Kuebler v. Nucare Servs. Corp.*, No. 14-CV-5265, 2016 WL 946950, at *3 (N.D. Ill. Mar. 14, 2016) (declining to consider summary charts and spreadsheets when plaintiffs failed to lay any foundation for the data therein). Setting aside the evidentiary problems presented by Martin's chart, the parties agree on the dollar amount of commission Martin earned on each deal, but not on his "split."[14]

The parties first discuss a transaction referred to as the Trifecta deal, which closed in 2019. Martin earned a commission of $66,322.50 on this deal. (DSOF ¶ 54; PSOAF ¶ 5.) Martin asserts that this amounted to a 15% commission "split," because JLL's "total fee" for the deal was $442,150, and 15% of $442,150 is $66,322.50. (DSOF ¶ 54.) Frustratingly, Martin has not explained the source of this $442,150 figure, and JLL does not confirm or deny that that was the total fee for the deal. JLL does assert that Martin's allocated revenue for the deal—after JLL held on to 8% and the brokers divided the remainder among themselves—was $110,537.50. (PSOAF ¶ 5; 2019 Commission Report, Ex. 30 to PSOF [138].) Martin then received a percentage of this allocated revenue as a commission, pursuant to the commission percentages laid out in Exhibit A to his Employment Agreement. Because Martin already exceeded $750,000 in total allocated revenue for the year by the time the Trifecta deal closed, he received 60% of the revenue allocated to him for that deal, or $66,322.50. (PSOAF ¶ 5; Employment Agreement, Exhibit A.) The parties offer two more examples, which follow a similar pattern: Martin argues that his commission splits were only 15% and 13.8% of each "total fee," whereas JLL argues that Martin's splits were, for both deals, 50% of his "allocated revenue." (DSOAF ¶ 5.)

---

[14] Martin objects that JLL's calculations are self-serving and speculative, but he offers no alternative method for calculating his earnings under either the old Comp Plan or the new model. (PSOFR ¶ 54.) Again, this information is ascertainable, and Martin has had access to discovery. If JLL's calculations are inaccurate, Martin could demonstrate this. He has not done so, and his objection is overruled.

### III.     Martin's Separation from JLL

From Mr. Martin's perspective, the new compensation structure and larger team reduced the amount he made on each deal compared to what he would have earned if JLL never acquired HFF.  (DSOF ¶ 49.)  Martin understood these changes to be "to his detriment" and thus in breach of his Employment Agreement.  So, a few months after the acquisition, he attempted to bring his concerns to the attention of JLL management.

### A.     Mr. Martin's Post-Acquisition Communications with JLL

On September 10, 2019, Mr. Martin sent a letter to Mr. Washington on behalf of himself and Ms. Koster raising concerns about the new compensation model.  (DSOF ¶ 59.)  The letter states that Martin and Koster were "writing jointly to [Washington] in connection with [their] identical Employment Agreements" and "Promissory Notes" to "express [their] concerns and [their] position with respect to changes that JLL has effected impacting [their] compensation and loan forgiveness terms."  (September 10, 2019 Letter, Ex. H to DSOF [128-8].)  The letter states that the merger of the JLL and HFF teams resulted in a "significant dilution of the revenues recognized under [Martin and Koster's] Employment Agreements."  (*Id.*)  "Additionally," the letter continues, "roles and responsibilities integral to the Employment Agreements have already changed considerably, and the explicit mechanisms detailed in the Employment Agreements through which JLL provides for staffing/travel & entertainment have been undermined."  (*Id.*)  The letter goes on to notify JLL that Martin and Koster have retained counsel, although they were "both optimistic" that Martin, Koster, and JLL leadership could reach an agreement without the need to involve legal counsel.  (*Id.*)

As JLL understood the letter, Martin and Koster were "seeking clarification regarding the post-acquisition structure of the Markets Group and information regarding their compensation plan moving forward, including whether it would be necessary to amend their Promissory Notes."  (PSOF ¶ 24.)  Martin sees things differently.  On his view, the purpose of the letter was "to bring these issues to the attention of JLL and to force JLL to comply with the terms of his Employment

Agreement." (DSOF ¶ 59.) During his deposition, Martin testified that he intended the September letter as "just a notice to say hey, let's go get this worked out" because "the terms of the deal had been unilaterally changed." (PSOFR ¶ 25 (quoting Martin Dep. at 65:24–66:5).) Martin further testified that, upon sending the letter, he had no intention of resigning. (PSOF ¶ 25.) And, on November 13, 2019, Martin sent an email to Jay Koster—JLL's president of investor services for the Americas—thanking Mr. Koster for "taking the lead" on addressing the September 10, 2019 letter. (November 13, 2019 Email, Ex. 15 to PSOF [138]; Dep. of Jay Koster, Ex. H to DSOF [128-6] at 18:21–25.) The email refers to a conversation in which Mr. Koster "mentioned a concept of converting 60% of the note balance to a fixed amortization schedule, with the balance still being subject to the existing percent-of-revenue based amortization scheme." (*Id.*) The email further reiterates Martin's concern that adding new members to his team meant a reduction in shares attributable to him, which would have "a direct effect on the amortization of the notes under the present scheme." (*Id.*) The parties do not say whether Mr. Koster responded directly to this email, and they do not provide further information about the parties' discussion regarding an alternate amortization scheme.

As mentioned above, on or about December 9, 2019, JLL proposed a new compensation plan for all CMG brokers. (PSOF ¶ 29.) JLL gave all J-Leg Capital Markets brokers a choice: they could continue working under their existing Employment Agreements and the JLL Comp Plan, or they could switch to a new compensation plan, effective January 1, 2020. (*Id.* ¶ 30.) JLL representatives met with brokers and their teams to ensure that it was "very clear that no former J-Leg employee that had an employment agreement had to go onto the new comp plan." (PSOFR ¶ 31 (quoting Koster Decl. ¶¶ 15–17).)

In response to JLL's announcement, Martin sent another letter to JLL on December 13, 2019. (DSOF ¶ 65.) The letter acknowledged JLL's December 9, 2019 proposal and reiterated the concern that Mr. Martin had expressed in his September letter. It stated that "as a consequence of the necessary integration and physical co-location of the JLL and HFF Denver

Multifamily teams, new business now being processed by the combined team is being split between the legacy JLL and legacy HFF teams—the result being a significant dilution to the revenues recognized under our Employment Agreements." (Dec. 19, 2019 Letter, Ex. 14 to PSOF [138].) The letter further stated that, due to "the lack of progress to reach an agreeable modification to the Promissory Notes," Martin expected to "take action to protect [his] interest" and that his counsel planned to send "a formal default/demand notice." (*Id.*)

On February 3, 2020, JLL received a letter from Mr. Martin's counsel addressing Martin's interest in reaching an agreement regarding his Promissory Note. (PSOF ¶ 33.) The letter's expressly stated purpose was to provide JLL legal notice of Mr. Martin's claims and give JLL an opportunity "to resolve the dispute short of a lawsuit." (February 3, 2020 Letter to Paul Washington from Rogge Dunn, Ex. 18 to PSOF [138].) Counsel expressed hope that "further discussions would benefit both parties" but warned that, "[i]n the absence of an agreed modification to the Note, [Martin] will exercise his rights under Section 3 of the Note and trigger the debt forgiveness provision of the note." (February 3, 2020 Letter at p. 2.) Without referring specifically to the "Good Reason" language of the Employment Agreement or setting any deadline for JLL's compliance, counsel's letter asserted that Martin was entitled to debt forgiveness "because JLL's unilateral changes to his benefits package, including his compensation and expenses described in Section 2 of the Employment Agreement (1) were material changes to his detriment, (2) were made without his consent; and (3) did not apply to all similarly situated employees of JLL." (*Id.;* PSOF ¶ 35; PSOFR ¶ 35.)

By February 18, 2020, however, negotiations had stalled. In an email on that date, Mr. Martin notified the JLL Denver Senior Managing Directors that "a resolution now appears unreachable," so Martin thought "it would be inappropriate" for him to attend an upcoming out-of-state meeting. (PSOF ¶¶ 38, 39.) The next day, Eric Tupler, one of the Capital Markets Heads for Denver, responded that he understood this email to mean that Martin was "planning on resigning" and asked him if that was his intention. (*Id.* ¶ 40.) Martin replied: "Afraid so, which is

17

certainly not my preference—but counsel is advising strongly to protect my interest." (*Id.* ¶ 41.) The following day, on February 20, 2019, Martin told Mark Katz, the other Denver Office head, over the phone that he was resigning but wanted "to stick around and continue to work on deals, if it all possible." (Katz Dep. at 41:3–10; 59:9–12 ("He said he was resigning; and he wanted to figure out a way that he could continue to work on his existing deals, but he was resigning and not paying back the loan.").)

According to Mr. Katz, JLL "didn't want [Martin] to leave," and JLL managers "tried to get some other folks involved" in convincing Martin to stay. (Katz Dep. at 41:21–26.) One of the higher-ups who got involved was John Gates, the CEO of JLL's Markets business in the Americas. Gates called Martin on February 28, 2020, and, during that call, Martin confirmed his intention to resign. According to Gates's deposition testimony, Martin said, "I'll have to resign." (Dep. of John Gates ("Gates Dep."), Ex. 11 to PSOF [138] at 71:2–4.) When asked whether Martin expressed an intent to resign at some point in the future, Gates recalled that Martin had said, "I have to resign then," which Gates understood to be "fairly immediate." (Gates Dep. at 71:7–10.) After this call, Gates emailed human resource personnel at JLL. (PSOF ¶ 43.) He recapped that Martin "felt he had no choice but to resign" but that Martin had stated that he "want[ed] to do it the right way." (February 28, 2020 Email, Ex. 26 to PSOF [138] at JLL 01341.) The following day, on February 29, 2020, Jody Thornton, President of JLL Capital Markets, Americas, emailed Martin, notifying him that Thornton had accepted what he understood to be Martin's resignation. (PSOF ¶ 44.) Thornton further informed Martin that JLL viewed his resignation as without "Good Reason" and, accordingly, payment on the outstanding balance of his loans would be due within 30 days. (February 29, 2020 Email, Ex. 20 to PSOF [138] at Martin-00040.) Martin did not respond to Thornton's email. (PSOF ¶ 44.) Between February 29, 2020 and March 3, 2020, Martin did, however, send emails to JLL key client contacts, stating: "It is with regret that I inform you of my resignation from JLL . . . hence, on advice of counsel I am forced to resign." (*Id.* ¶ 45.) Martin sent similar emails to numerous JLL employees. (*Id.* ¶ 46.)

### B.    The Aftermath of Mr. Martin's Separation

After Martin left JLL, JLL sent him a Confidential Separation Agreement and General Release, neither of which documentbo is in the record.  (DSOF ¶ 75.)  Martin did not execute the Separation Agreement.  (*Id.* ¶ 77.)  The Comp Plan required Martin to send a "protected deal list" upon his termination.  Martin arguably satisfied this condition: On May 1, 2020, by and through his counsel, Martin submitted a copy of his protected deal list to JLL.  (Ex. K to DSOAF [144-1].)  JLL acknowledged receipt of the protected deal list on May 7, 2020.  (Ex. L to DSOAF [144-2].)

To date, Mr. Martin has not repaid the balance of his loan, the outstanding balance of which, according to JLL, is $1,701,235.11, not including attorneys' fees, with interest and attorneys' fees continuing to accrue.  (PSOF ¶ 47.)  For his part, Martin identifies six deals for which he claims JLL owes him trailing commissions, referred to as Allure (closed August 18, 2020), Avant Castle Pines (closed September 30, 2020), Parkhouse (closed September 22, 2020), Crestone (closed October 30, 2020), Canvas on Blake (closed November 23, 2020), and Altitude Westminster (closed December 16, 2020).  (*Id.* ¶¶ 58–60.)  Martin claims that he is owed commissions from these deals in total of $702,119.  (DSOF ¶ 79.)

## IV.    Procedural History

On June 17, 2020, JLL filed suit against Martin for breach of contract [1], invoking the court's diversity jurisdiction.[15]    28 U.S.C. §1332(a). On September 1, 2020, Martin filed five counterclaims against JLL [16].  In late 2021, the parties moved for summary judgment and fully briefed their motions.  In an oral argument on these motions, this court noted that neither party had submitted financial records concerning Mr. Martin's compensation, the "scrape," or personnel expense reimbursement before and after JLL's acquisition of HFF [111].  The parties also had not submitted records reflecting the closing of real estate deals for which Martin claims the right to

---

[15]        JLL is a Maryland Corporation with its corporate headquarters and principal place of business located in Chicago, Illinois.  (Compl. ¶ 2.)  According to the Complaint, Martin is a resident, domiciliary, and citizen of Colorado.  (*Id.*)

commission. In light of these significant evidentiary gaps, the court struck the parties' motions without prejudice.

The parties have now submitted renewed cross-motions for summary judgment. Martin identifies "three material claims" on which the court should declare he is entitled to prevail: (1) that Martin was terminated without cause; (2) that, alternatively, Martin resigned with "Good Reason"; and (3) that he is entitled to roughly $700,000 in commission payments. (Def.'s Am. Mot. for Summ. J. (hereinafter "Def.'s Br.") [127] at 2.) JLL moves for summary judgment [130] on its breach of contract claim and Defendant's four remaining counterclaims: declaratory judgment (Count I); breach of contract (Count II); unjust enrichment (Count III); and unpaid wages (Count IV).

## DISCUSSION

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022) (internal quotation marks omitted). "On cross-motions for summary judgment, all facts and inferences are drawn in the light most favorable to the nonmoving party on each motion." *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (internal quotation marks omitted).

Both parties seek summary judgment on their breach-of-contract claims. JLL argues that Martin breached the terms of his Promissory Note by failing to pay back his loan without justification, and Martin argues that JLL breached the terms of his Employment Agreement by failing to pay him trailing commissions for deals he worked on that closed after he left JLL. Illinois

contract law governs both claims.[16] "Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158–59 (7th Cir. 2015) (internal quotation marks omitted). With respect to each party's breach of contract claim, the first, second, and fourth elements are clear and uncontested. For both parties' claims, the only disputed issue is the third element: breach.

## I.      JLL's Breach of Contract Claim

JLL's breach-of-contract claim entails three issues: (1) whether Martin resigned or was terminated from his position; (2) if Martin resigned, whether JLL materially changed Martin's benefits or commission splits to his detriment without his written consent; and (3) if such a detrimental change did occur, whether the change applied to all similarly-situated employees. The court addresses these issues in turn.

### A.      Termination versus Resignation

Under the terms of the Amended Promissory Note, Mr. Martin is relieved from paying back his loan if he resigned with "Good Reason" or if JLL terminated him without cause. (Employment Agreement ¶ 3.) Different provisions apply depending on whether Martin resigned or was terminated. Martin argues that "[t]he record evidence supports [finding] that [his] separation from JLL occurred in one of [two] ways": either "(1) JLL terminated [him] without cause; or (2) [he] resigned with 'Good Reason.'" (Def.'s Br. at 9.) JLL argues that the evidence supports only one conclusion on this issue: Martin resigned. (Pl.'s Mem. in Supp. of its Renewed Mot. for Summ. J. ("Pl.'s Br.") [132] at 10.) The court agrees with JLL.

---

[16]      The Promissory Note states that Martin "agrees that this Amended Note shall be governed by and construed in accordance with the laws of the State of Illinois." (Am. Promissory Note § 8.) The Employment Agreement states that "[t]his agreement is governed by the law of the State of Illinois." (Employment Agreement ¶ 11.)

Beginning in late 2019, Mr. Martin expressed his belief that JLL was in breach of his employment agreement, but it appears he nevertheless intended to remain employed by JLL at that time.  Things changed, however, by February 2020.  In an email exchange on February 18 and 19, Martin wrote that the sides had "reached an impasse" and that a resolution appeared "unreachable"; when a Denver office co-head, Tupler responded by asking whether that meant Martin was resigning, Martin confirmed that he was doing so upon advice of counsel.  (February 18, 2020 Email, Ex. 19 to PSOF [138] at JLL 001266.)  According to JLL, Martin again announced his resignation during the February 28, 2020 phone call with Gates.  In his email to JLL officials that day, Gates stated that Martin "felt he had no choice but to resign" and that Martin had an interest in wrapping up the JLL deals he was working on with Robbins and Koster.  (February 28, 2020 Email, Ex. 26 to PSOF [138] at JLL 001341.)

The next day, Thornton advised Martin by email that JLL had "accept[ed] [his] resignation." (February 29, 2020 Email, Ex. 20 to PSOF [138] at MARTIN-000040.)  Martin suggests that Thornton's message could also be construed as terminating his employment—but any ambiguity was cleared up by Martin himself in numerous emails that he subsequently sent to clients and coworkers, for the stated purpose of "inform[ing the recipient of his] resignation from JLL." (February 29–March 3 Emails, Ex. 21 to PSOF [138] at MARTIN-000049–63.)  Those emails were explicit in characterizing Martin's separation from JLL as a resignation: "Unfortunately, it became clear over the past few days that a mutually agreeable framework is not achievable; hence, on advice of counsel I am forced to resign."  (*See, e.g.*, *id.* at MARTIN-000056.)  In his briefing, Martin only addresses these emails once; in a footnote he writes that "he was sharing his separation more broadly as a 'resignation' to be diplomatic about his departure."  (Def.'s Opp. at 20.)  The court is unable to reconcile Martin's contemporaneous assertions to numerous parties that he had resigned with his current argument that he was terminated.  There is no genuine dispute of material fact regarding the nature of Martin's separation from JLL: Martin resigned.

### B. Resignation for "Good Reason"

Mr. Martin's Amended Promissory Note states that JLL will forgive the balance of his loan if Martin resigns with "Good Reason." (Am. Promissory Note § 3.) Martin has "Good Reason" to resign if JLL "materially changes [his] commission splits or benefits package to the detriment of [Martin] without [Martin's] prior written consent, unless such change applies to all similarly-situated employees of [JLL]." (*Id.*) Martin can only resign for "Good Reason" if he first "provides [JLL with] written notice of the basis for such resignation and [JLL] fails to cure within thirty (30) days following receipt of such notice." (*Id.*)

The parties adamantly disagree on the meaning of the phrase "commission splits," though both sides contend the phrase is unambiguous. (*See* Def.'s Br. at 5; Pl.'s Br. at 2.) JLL argues that the phrase refers to the percentage share of a transaction that Martin earns in commission, as stated in Exhibit A to Martin's Employment Agreement. (Pl.'s Br. at 8.) The parties agree that those percentages (50%, 55%, and 60%) remained unchanged during Martin's employment. Martin does not dispute that those percentages are part of his "commission splits," but Martin argues that "splits" is broader than the "percentages" listed in Exhibit A because "splits" refers to the ultimate division of revenue between JLL and Martin following a transaction. (Def.'s Br. at 11–13.) Martin argues his "splits" were materially altered following JLL's acquisition of HFF in two ways: (1) JLL began taking an 8% "scrape," and (2) Martin was required to share revenue with additional brokers. (*See* Def.'s Br. at 5–8.)

Although the parties' briefs heavily focus on the proper definition of "commission splits," the court need not determine which party's interpretation is correct. As explained below, even under Mr. Martin's broader definition, it is not clear that the changes were detrimental to his earnings. Moreover, Martin has failed to rebut JLL's evidence that the changes were consistent with Martin's earning more money overall than he had in previous years. Nor has Martin established that the changes JLL implemented were not applicable to similarly-situated employees.

### 1.    Evidence of Detrimental Change

Martin resigned for "Good Reason" if JLL unilaterally changed his commission splits to his detriment.  (Am. Promissory Note § 3.)  The parties offer competing arguments for the meaning of the word "detriment."  JLL makes the common-sense assumption that a change would be "to the detriment" of Martin if it resulted in his earning less money than he had earned prior to the change.  (*See* Pl.'s Opp. to Def.'s Am. Mot. for Summ. J. ("Pl.'s Opp.") [147] at 11–12.)  In Martin's view, his gross income is irrelevant, and "detriment" must "be evaluated on a deal-by-deal basis." (Def.'s Reply [153] at 6.)  To support this contention, Martin points to the grammatical structure of the phrase at issue.  As the court understands him, Martin contends that "to the detriment of" modifies "commission splits" and "benefits plan," meaning that a change that resulted in a decrease in any one commission split would be Good Reason for his resignation.  (*See id*.)  This argument has little to recommend it: the prepositional phrase "to the detriment of" clearly refers to the word that immediately follows it: "Maker" (of the Promissory Note)—that is, Martin.  The contract permits Martin to resign for "Good Reason" if JLL changes his commission splits or benefits package to the detriment of Martin himself.  It is not unreasonable to conclude that, if Martin would earn more after the acquisition, then JLL's changes to his compensation plan were not to his detriment.

The evidence that would easily clear up any confusion on this issue would be financial records showing that Mr. Martin's compensation decreased after JLL's acquisition of HFF.  The court pointed this out to the parties at oral argument after they submitted their initial summary judgment motions, and the court invited the parties to submit financial records demonstrating the effect of JLL's post-acquisition changes to Martin's earnings.  (Transcript at 10:5–19.)  At that proceeding, the court noted that "the most fundamental question in this case" is "how much money ended up in [Martin's] pocket before and after" the acquisition.  (*Id*. at 11:14–17.)  As an example of helpful evidence, the court suggested that Martin could submit his tax returns for years before and after the changes of which he complains.  (*Id*. at 32:22–33:2.)  The court also requested

evidence of Robbins's financial contributions to the pool that was then split with Koster and Martin as evidence of whether adding Robbins to the team was detrimental or beneficial to Martin.[17] (*Id.* at 34:4–11.)

As Plaintiff, it is JLL's burden to show that Mr. Martin did not resign for "Good Reason." JLL has done so by presenting evidence that adding Robbins to the Denver team was a major boon to JLL and Martin alike. (*See, e.g.*, 2020 Year End ECR, Ex. 31 to PSOF [138].) Martin, on the other hand, has not attempted to satisfy the court's instructions. Significantly, Martin has not submitted tax returns or other financial records demonstrating that post-acquisition changes caused him any concrete harm. Martin also does not contest JLL's assertion that he would have earned more overall after the acquisition. Instead, Martin counters that he would have earned *even more* if JLL had not implemented the changes at issue. He notes, in fact, that in his post-JLL employment, he earned "significantly more" in compensation due to major growth in the Denver real estate market in recent years. (Def.'s Opp. at 16.) (How this confirms his claim of harm is unclear to the court.) Ideally, he points out, the record would contain evidence of how Martin and Koster would have fared if the post-acquisition changes never occurred, to compare with evidence of how they performed with the new HFF brokers inserted onto their team (*id.* at 9–10), but neither Martin himself nor JLL have submitted such evidence, if it exists at all.

JLL has presented at least some evidence that Martin stood to earn greater amounts under the new compensation plan. Rather than present his own evidence, Martin maintains that JLL's is insufficient, and speculates about greater amounts he might have recovered under the old plan. JLL appears to have the better of this argument, but the court need not make a final

---

[17] As noted earlier, the court requested additional evidence regarding the consequence of the 8% scrape on Martin's compensation as compared to JLL's prior "holdback" structure. (*See* Transcript at 36:3–7.) JLL has presented some evidence that Martin would have fared better under the 8% model versus the old 6%/3% structure. Martin objects to JLL's calculations as lacking foundation, but he proposes no alternative calculation to compare his earnings under the "scrape" to his earnings under the old "holdback" model.

determination on this issue.  As explained below, Martin has not shown that the changes he complains of did not apply to all "similarly-situated employees."

### 2. Effect on Similarly-Situated Employees

As noted, Martin could resign for "Good Reason" only if JLL changed his commission splits or benefits package to his detriment, and if those changes did not apply "to all similarly-situated employees."[18]  (Am. Promissory Note § 3.)  Yet it is undisputed that the post-acquisition change in compensation structure affected all J-Leg CMG brokers and that the changes equally affected all the Denver Multifamily team brokers.  (DSOFR ¶¶ 29–31.)  Some of this evidence comes from Martin's own deposition, in which he consistently used the collective "we" when describing changes to the terms of his employment following the acquisition.  (Martin Dep. at 52:1–23 ("We no longer had the 6 percent and 3 percent contributions from JLL, and the staffing that were supporting those were taken away from us.  We no longer had hiring and firing decisions on those staffing people.  We no longer signed listing agreements.")  Indeed, throughout his deposition, Martin states that the compensation changes applied to individuals other than himself.[19]  (See, e.g., Martin Dep. at 34:2–4 ("The splits changed because we had merged teams, and we were under a new operating metric.").)

---

[18]  The term "similarly-situated employees" often appears in employment discrimination suits.  In that context, the phrase refers to employees who are "directly comparable in all material respects."  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).  The court adopts that meaning of the phrase here.

[19]  Mr. Martin made several similar statements, perhaps referring to the full brokerage team, including personnel from HFF, but also referring to himself and Ms. Koster.  Thus, he remarked that, after he and Koster began doing business with Mr. Robbins, "we basically went under the HFF comp plan and ran it that way," which "changed on the ground exactly what we were doing."  (Martin Dep. at 35:8–10; *see also id.* at 49:22–50:9 ("Our commission splits changed by virtue of the facts on the ground.  At JLL's insistence, we put the two teams together.  We started processing business together.  The splits were not changed for deals that were already in process that we finished up under the old plan, but once we started doing business together at or about late July or early August of 2019, our splits had changed, not just the percentages you keep harping on, but the 6 percent, the 3 percent, and the allocations, which is all wrapped up into the splits."); 50:21–22 ("[W]e were operating under the new plan."); 56:9–11 ("To be a team, you have to be on one comp plan.  We had done that.  We had come together and had one comp plan.").)

Though Mr. Martin did not always identify who he included in "we," Ms. Koster—who worked as Martin's brokerage partner at all times during his employment—undoubtedly qualifies as a similarly-situated employee. Martin has stated that he and Koster had "identical Employment Agreements," and the same "original and Amended Promissory Notes." (PSOF ¶ 50.) Like Martin, Koster faced changes to JLL's compensation plan, and she was affected (positively, in her view) by Robbins's joining the team. (Koster Decl. ¶¶ 13, 15, 24.) Martin has not identified any post-acquisition changes that applied to him but not to Koster.

Mr. Martin's arguments on this issue are not persuasive. He first asserts that it is "meaningless" to refer to "J-Leg CMG broker[s]" as similarly-situated employees and that, as he reads it, JLL may trigger the "unless" clause only if "such change occur[s] to all employees." (Def.'s Opp. at 16, 17.) That interpretation entirely disregards the phrase "similarly-situated." Next, Martin suggests that the clause is only triggered if such changes apply to all JLL brokers "at the same time" and that this test is not met because Denver was "the first office to merge in the entire JLL/HFF system." (*Id.* at 17 (quoting Martin Dep. at 36:12–37:16).) Whatever the merit of the notion that the Denver office was unique, it ignores the obvious: that the changes also applied to other J-Leg brokers, including Ms. Koster. Martin's final argument is that "brokers around the Country[] were treated in all sorts of different manners." (*Id.*) But the deposition testimony he cites does not include a discussion of brokers around the country; it merely states that "we were told we were the first offices to merge in the entire JLL/HFF system." (Martin Dep. at 36:20–21.) Even if Martin could show that the post-acquisition changes were to his detriment, on this record he cannot show that any such change did not also apply to similarly-situated JLL employees.

### C. Notice and Cure Period

Because Mr. Martin cannot prove that he resigned with "Good Reason," the court need not decide whether the record supports a finding that he complied with the remaining requirements for relief from payment of the promissory note. Whether he gave proper notice and provided JLL with an opportunity to cure is inconsequential to the outcome of the parties' motions.

Because a reasonable jury could not find that Martin resigned with "Good Reason" as defined by his Employment Agreement, he has no justification for failing to pay back his loan, and thus has breached the terms of his Promissory Note. JLL is entitled to summary judgment on this claim.

## II.    Martin's Claim for Trailing Commissions

That leaves the issue raised by Mr. Martin's counterclaims. First, he argues that he is entitled to commissions for deals that he worked on that closed after his departure from JLL. Under the terms of the Employment Agreement, Martin is entitled to trailing commissions in accordance with the Comp Plan if he "executes and does not revoke a Confidential Separation Agreement and General Release." (DSOF ¶ 17.) The Comp Plan states that Martin is entitled to trailing commissions for deals that—among other qualifiers not at issue here—closed "within 180 days after the termination date."[20]   (Comp Plan § 2.)   Further, according to the Employment Agreement, any payment he is due will be offset by debt he owes to JLL. (*Id.*)

### A.    Separation Agreement

The parties' first disagreement concerns the condition requiring Mr. Martin to "execute and [] not revoke a Confidential Separation Agreement and General Release in substantially the same form attached hereto as Exhibit A." (Employment Agreement ¶ 4(b).) It is undisputed that Martin did not execute the Separation Agreement that JLL provided to him after his resignation, but no draft Separation Agreement was attached to Martin's Employment Agreement when he signed the document in 2018. (DSOFR ¶ 18.) And the one JLL proffered in 2020 was, according to Martin, "onerous," "not reasonable," and "not contemplated by the Employment Agreement." (Def.'s Br. at 15.)

In Mr. Martin's view, "[b]ecause a release was not included with the Employment Agreement, and because JLL failed to provide a reasonable release to Mr. Martin, he was not

---

[20]    The Comp Plan also requires Martin to send a protected deal list upon his termination. Martin arguably satisfied this condition: On May 1, 2020, by and through his counsel, Martin submitted a copy of his protected deal list to JLL. (Ex. K to DSOAF [144-1].) JLL acknowledged receipt of the protected deal list on May 7, 2020. (Ex. L to DSOAF [144-2].)

required to sign one." (Def.'s Br. at 15 (citing *Arlington Devco v. T10 Meltel, LLC*, No. 15-C-3558, 2017 WL 743889, at *3 (N.D. Ill. Feb. 27, 2017) ("When a contract contains an express condition precedent, strict compliance with such a condition is required.").) Although Martin asserts that the Agreement he did receive was "unreasonable," the record evidence he cites does not support that description. (*Id.* (citing DSOF ¶ 75 (citing Katz Dep. 15:21–16:16 (testifying that the Confidential Separation Agreement Martin received is a form document)).) In his declaration, Martin did not describe the content of the Separation Agreement he received at all—he merely stated that he did not sign it because it was not attached to the Employment Agreement. (Martin Decl. ¶ 65.) The Separation Agreement is not in the record, and there is no evidence that it was not "in substantially the same form" as the form that would have been attached to the Employment Agreement. (*See* Employment Agreement ¶ 4(b).) As a result, the court is not prepared to say whether its terms were onerous and unreasonable.

### B.    Date of Deal Closings

Assuming, without deciding, that Martin was excused from the condition requiring him to execute a Separation Agreement, he would not be entitled to the majority of commissions he seeks. Martin's resignation was effective on February 29, 2020, so Martin would only be eligible for trailing commissions on deals that have closed on or before August 27, 2020. (PSOF ¶ 45.) In an exhibit attached to his declaration, Mr. Martin lists six deals that were in progress as of February 29, 2020: Allure, Avant Castle, Pines, Parkhouse, Crestone, Canvas on Blake, and Altitude Westminster.[21] (Ex. A to Martin Decl. [128-1].) Five of these six deals, however, closed more than 180 days after Martin resigned from JLL. Only Allure, which closed on August 18, 2020, falls within the relevant time frame. (PSOF ¶¶ 59, 60.) At most, Martin would be able to

---

[21]    In his declaration, Martin states that, at the time of his separation, he "was working on approximately eight deals." (Martin Decl. ¶ 61.) The exhibits attached to his declaration, however, only account for six deals, and Mr. Martin does not explain what the remaining two deals could be.

recover the commissions owed to him on the Allure deal only (and he does not calculate what his share of revenues for that deal would be).

### C. Material Contractual Breach

Mr. Martin may not recover trailing commissions for the Allure deal because he has breached the terms of his Amended Promissory Note. The Comp Plan states that Martin would not be eligible for trailing commissions "if [Martin] violates any material contractual or ethical obligations to [JLL]." (Comp Plan § 2(b).) Martin has violated a contractual obligation by failing to repay the loan within 30 days of his resignation. (Am. Promissory Note § 3.) Martin does not argue otherwise. He instead argues that the court should disregard the Comp Plan because it imposes contract terms that are not present in the Employment Agreement. (Def.'s Opp. at 22.) This argument ignores the plain language of the Employment Agreement, by which Martin expressly agreed "to comply with all other JLL policies, including but not limited to JLL's [Comp Plan]." (Employment Agreement ¶ 1(a).) *D&B II Enters. LLC v. Universal Tax Sys.*, No. 13-C-5702, 2018 WL 1561727, *6 (N.D. Ill. Mar. 31, 2018) (Illinois law permits contracts to "incorporate all or part of another document by reference"). The Employment Agreement itself states that employees are "entitled to receive the additional payments and benefits provided by the Comp Plan then in effect." (Employment Agreement ¶ 4(b).) In short, the Comp Plan explains the conditions of Martin's eligibility for trailing commission payments. Martin was not entitled to recover trailing commissions unless he satisfied the conditions set forth in the Comp Plan, and he has not done so.

Because Martin cannot show that he has met the conditions precedent to receive trailing commissions, JLL is entitled to summary judgment on his breach-of-contract counterclaim.

### III.     Martin's Remaining Counterclaims

#### A.     Martin's First Count: Declaratory Judgment

JLL moves for summary judgment on this count.  Martin concedes that this cause of action seeks the same relief as his breach of contract claim and he thus agrees to dismiss this count. (Def.'s Opp. at 20.)  JLL's motion is granted.

#### B.     Martin's Third Count: Unjust Enrichment

JLL moves for summary judgment on this count.  JLL argues that Martin may not bring a claim for unjust enrichment that is predicated on the same facts and circumstances of a breach of contract claim.  (Pl.'s Br. at 15.)  Indeed, in his third count, Martin asserts that "it would be inequitable for JLL to retain [revenue from the deals Martin brought to JLL] without paying Mr. Martin the commission he is owed under the Employment Agreement."  (Def.'s Am. Countercl. [33] ¶¶ 52–54.)  JLL is correct that a claim for enforcement of the Employment Agreement must be brought as a breach of contract, not unjust enrichment.  *See Miller v. Lewis Univ.*, 553 F. Supp. 3d 678, 687 (N.D. Ill. 2021).  JLL's motion is granted.

#### C.     Martin's Fourth Count: Common Law Unpaid Wages

JLL moves for summary judgment on this count.  JLL argues that there is no such thing as a "common law unpaid wage" claim.  (Pl.'s Br. at 15–16.)  Martin does not dispute that argument, but instead responds by stating that this cause of action is viable under the Colorado Wage Act.  (Def.'s Opp. at 23.)  Martin did not plead any claim under the Colorado Wage Act; he pleaded a claim under the "common law" (and Martin has not sought leave to amend his counterclaim).  (*See* Def.'s Am. Countercl. ¶¶ 55–59.)  Most significantly, the "unpaid wages" that Martin alleges in his counterclaim cannot be anything other than the trailing commissions he believes he was entitled to receive.  As discussed above, Martin has no such entitlement to any trailing commission, and thus he has no claim—under common law or any statute—for unpaid wages.  JLL's motion is granted.

## **CONCLUSION**

For the reasons discussed above, Plaintiff's renewed motion for summary judgment [130] is granted and Defendant's renewed motion for partial summary judgment [127] is denied. The court will enter judgment in favor of Plaintiff JLL and against Defendant Martin.

ENTER:

Dated:  July 21, 2023

_____
REBECCA R. PALLMEYER
United States District Judge